No. 23-2140

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

REBECCA CURTIN,

*Appellant*

v.

UNITED TRADEMARK HOLDINGS, INC.,

*Appellee*

Appeal from the United States Patent and Trademark Office,
Trademark Trial and Appeal Board in No. 91241083

# OPENING BRIEF OF APPELLANT REBECCA CURTIN

JOHN C. STRINGHAM
MATTHEW A. BARLOW
DAVID R. TODD
RYAN C. MORRIS
WORKMAN NYDEGGER
60 E. South Temple St., Ste. 1000
Salt Lake City, UT 84111
(801) 533-9800

*Counsel for Appellant*
*Rebecca Curtin*

## CERTIFICATE OF INTEREST

The undersigned counsel certifies the following:

1. The full name of every party represented by the undersigned is:
   **Rebecca Curtin**

2. The real party in interest represented by the undersigned is:
   **Rebecca Curtin**

3. All parent companies and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:
   **None**

4. The names of all law firms and the partners or associates that appeared for the parties now represented by the undersigned in the trial court or are expected to appear in this court (and who have not entered an appearance in this case) are:
   **None**

5. Other than the originating case number(s), the title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:
   **None**

6. Any information required under Fed.R.App.P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):
   **None**

DATED: November 20, 2023

*/s/ Matthew A. Barlow*

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i
TABLE OF CONTENTS ........ ii
TABLE OF AUTHORITIES ........ iv
STATEMENT OF RELATED CASES ........ vii
INTRODUCTION ........ 1
JURISDICTIONAL STATEMENT ........ 4
STATEMENT OF THE ISSUES ........ 4
STATEMENT OF THE CASE ........ 4
A. Statutory Background ........ 4
B. Factual Background ........ 7
C. Proceedings Below ........ 10
SUMMARY OF ARGUMENT ........ 16
ARGUMENT ........ 20
I. STANDARD OF REVIEW ........ 20
II. CURTIN IS ENTITLED TO OPPOSE REGISTRATION UNDER SECTION 13 OF THE LANHAM ACT ........ 20
III. THE BOARD ERRED IN CONCLUDING CURTIN IS NOT ENTITLED TO OPPOSE REGISTRATION ........ 24
A. The Board Erred by Imposing the *Lexmark* Framework on Agency Opposition Proceedings ........ 25
B. Even Under the *Lexmark* Framework, the Board Erred in Concluding that Curtin Is Not Entitled to Oppose Registration ........ 33
1. The Board Erred in Concluding Curtin's Interests Do Not Fall within the Zone of Interests Protected by Section 13 ........ 34
2. The Board Erred in Concluding Curtin's Injuries are not Proximately Caused by the Alleged Violation ........ 41

CONCLUSION....................................................................................................47
ADDENDUM
CERTIFICATE OF SERVICE
CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AVX Corp. v. Presidio Components, Inc.*,
923 F.3d 1357 (Fed. Cir. 2019) .......... 28

*Bankers Trust New York v. United States*,
225 F.3d 1368 (Fed. Cir. 2000) .......... 30

*Carter v. McDonough*,
46 F.4th 1356 (Fed. Cir. 2022) .......... 44

*CES Publishing Corp. v. St. Regis Publications*,
531 F.2d 11 (2d Cir. 1975) (Friendly, J.) .......... 38, 45

*Corcamore, LLC v. SFM, LLC*,
978 F.3d 1298 (Fed. Cir. 2020) .......... 14, 31, 32, 40

*Cuozzo Speed Techs., LLC v. Lee*,
579 U.S. 261 (2016) .......... 28

*Door Sys., Inc. v. Pro-Line Door Sys., Inc.*,
83 F.3d 169 (7th Cir. 1996) .......... 21, 45

*Empresa Cubana Del Tabaco v. General Cigar Co.*,
753 F.3d 1270 (Fed. Cir. 2014) .......... 21

*Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n*,
194 F.3d 72 (D.C. Cir. 1999) .......... 19, 27, 32

*FDRLST Media, LLC v. NLRB*,
35 F.4th 108 (3d Cir. 2022) .......... 27

*Fly, Inc. v. Dollar Park & Fly, Inc.*,
469 U.S. 189 (1985) .......... 37

*Fund Democracy, LLC v. SEC*,
278 F.3d 21 (D.C. Cir. 2002) .......... 27

*Kellogg v. Nat'l Biscuit Co.*,
305 U.S. 111 (1938) .......... 38

*Lexmark International, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2021) .......... *passim*

*Ritchie v. Simpson*,
170 F.3d 1092 (Fed. Cir. 1999) .......... *passim*

*Strickland v. United States*,
423 F.3d 1335 (Fed. Cir. 2005) .......... 29, 30

*Virgin Enterprises Ltd. v. Nawab*,
335 F.3d 141 (2d Cir. 2003) .......... 41

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
529 U.S. 205 (2000) .......... 45, 46

**Statutes**

5 U.S.C. § 553(c) .......... 34

15 U.S.C. § 1051 et seq. .......... *passim*

15 U.S.C. § 1052(a) .......... 39

15 U.S.C. § 1052(e) .......... 45

15 U.S.C. § 1062(a) .......... 6, 33

15 U.S.C. § 1062(b) .......... 6

15 U.S.C. § 1063 .......... *passim*

15 U.S.C. § 1063(a) .......... 2, 6, 33

15 U.S.C. § 1063(b) .......... 7, 33

15 U.S.C. § 1064 .......... *passim*

15 U.S.C. § 1064(1)–(6) .......... 31

15 U.S.C. § 1064(a), (b) ........ 7

15 U.S.C. § 1067 ........ 6

15 U.S.C. § 1071(a) ........ 5

15 U.S.C. § 1071(a)(2) ........ 5

15 U.S.C. § 1114(1)(a) ........ 8, 9

15 U.S.C. § 1125 ........ 14, 15

15 U.S.C. § 1125(a) ........ *passim*

15 U.S.C. § 1127 ........ 35, 36, 37

28 U.S.C. § 1295(a)(4)(B) ........ 5

Administrative Procedure Act ........ 26

**Other Authorities**

37 C.F.R. § 2.145(d) ........ 5

3 J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 20:2 (5th ed.) ........ 33, 34

1 *McCarthy on Trademarks and Unfair Competition* § 2:22 (5th ed.) ........ 37

2 *McCarthy on Trademarks and Unfair Competition* § 12:2 (5th ed.) ........ 38

S. Rep. No. 1333, 79th Cong. 2d Sess. (1946) ........ 38

## STATEMENT OF RELATED CASES

No appeal in or from the same proceeding before the Trademark Trial and Appeal Board was previously before this or any other appellate court. Counsel are not aware of any case pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision in this case.

# INTRODUCTION

Section 13 of the Lanham Act provides that "[a]ny person who believes that he would be damaged by the registration of a mark … may … file an opposition in the Patent and Trademark Office." 15 U.S.C. § 1063(a). The Trademark Trial and Appeal Board ("Board") concluded, however, that Congress cannot be allowed to mean what it said. According to the Board "any person" is in fact limited solely to someone "with commercial interests." Appx11. And the damage sought to be avoided is limited to commercial competitors' economic or reputational losses that cannot rely on any intervening harm to another. Thus, according to the Board, Rebecca Curtin ("Curtin")—a longtime collector without a commercial interest—is not entitled to oppose United Trademark Holdings' ("UTH's") application to register the mark RAPUNZEL. The Board's decision is fundamentally wrong and cannot stand.

The Board reached its erroneous conclusion by determining that a person may oppose registration of a mark only when doing so is within the zone of interests protected by the statute and the person's injury would be proximately caused by registration of the mark. The Board

reached that determination based on the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2021), which addressed the requirements for a plaintiff to have a statutory cause of action in federal court for false advertising under 15 U.S.C. § 1125(a). But Section 13 of the Lanham Act is not about a cause of action in court. Instead, it is about an administrative process. Courts have long recognized that the standards applicable to a private right of action in court do not apply to administrative proceedings. Indeed, this Court in *Ritchie v. Simpson*, 170 F.3d 1092 (Fed. Cir. 1999), explicitly relied on this distinction in concluding that a person need only satisfy the plain terms of Section 13 to oppose registration of a trademark. The Board erred in disregarding *Ritchie*—this Court's controlling authority on entitlement to oppose a trademark registration—and imposing a standard reserved for causes of action in federal court.

Even if the framework in *Lexmark* is applicable, however, the Board erred. Specifically, the Board erred in concluding that Curtin's interests do not fall within the zone of interests protected by Section 13 or that the harms to her would not be proximately caused by the alleged violations of the Act. The Board imported the Supreme Court's holdings in *Lexmark*

with respect to a false-advertising claim under § 1125(a) without addressing the fact that the case at hand does not involve a false-advertising claim but arises in a different context altogether. This distinction matters because the Court in *Lexmark* explained that the "'zone of interests varies according to the provisions of law at issue,'" *Lexmark*, 572 U.S. at 130, and the proximate-cause analysis "is controlled by the nature of the statutory cause of action," *id.* at 133. Moreover, *Lexmark* held that an "intervening step" in causation "is not fatal to the showing of proximate causation." *Id.* The Board, however, did not attempt to assess the interests protected by Section 13 or vary the analysis based on that provision or the Supreme Court's instructions.

In sum, the Board fundamentally erred in concluding that Curtin is not entitled to oppose UTH's application to register the mark RAPUNZEL. Because Curtin sufficiently established a reasonable basis to believe that she would be damaged by the registration of RAPUNZEL, she is entitled to oppose registration under the plain terms of Section 13 and this Court's precedents. Accordingly, the Court should reverse and remand for further proceedings.

## JURISDICTIONAL STATEMENT

UTH filed an application with the United States Patent & Trademark Office ("PTO") to register the trademark RAPUNZEL on November 20, 2017. Appx2, Appx38–44. The PTO published the mark for opposition on April 10, 2018. Appx45–46. On May 9, 2018, Curtin timely filed a notice of opposition to the registration. Appx45–49. The Board issued an opinion dismissing Curtin's opposition on May 4, 2023. Appx1. Curtin timely filed a notice of appeal to this Court on July 5, 2023. Appx2781–82; 15 U.S.C. § 1071(a)(2); 37 C.F.R. § 2.145(d). This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(B) and 15 U.S.C. § 1071(a).

## STATEMENT OF THE ISSUES

Whether the Board erred in dismissing Curtin's opposition by misinterpreting the Lanham Act, misconstruing governing precedent, and disregarding this Court's case law.

## STATEMENT OF THE CASE

### A. Statutory Background

The Lanham Act erects a system "for the registration and protection of trademarks used in commerce." Lanham (Trademark) Act, Pub. L. No. 79-489, 60 Stat. 427 (July 5, 1946), codified at 15 U.S.C. § 1051 et seq. The Act first establishes an administrative process for

trademark owners to register their marks on the principal register, which is administered by the PTO, and sets forth conditions for refusing to register certain trademarks. *See* 15 U.S.C. §§ 1051–52.

Once an applicant files a trademark application, the PTO refers the application to a PTO examining attorney. 15 U.S.C. § 1062(a). If the PTO examining attorney determines that the applicant is not entitled to register the mark, then it provides the applicant with a period of time to respond to the rejection or amend the application. 15 U.S.C. § 1062(b). If, on the other hand, it appears to the PTO examining attorney that the applicant is entitled to register the mark, the PTO "shall cause the mark to be published in the Official Gazette of the Patent Office." *Id.* § 1062(a).

Under Section 13 of the Act, codified in 15 U.S.C. § 1063, "[a]ny person who believes that he would be damaged by the registration of a mark … may … file an opposition" with the PTO within 30 days of the PTO's publication of the mark in the Official Gazette. 15 U.S.C. § 1063(a). In every opposition, the PTO Director must give notice to all parties and "shall direct a Trademark Trial and Appeal Board to determine and decide the respective rights of registration." 15 U.S.C. § 1067. "In such proceedings," the Board (on behalf of the Director) "may refuse to register

the opposed mark, … may modify the application …, or may register the mark." *Id.* § 1068. "Unless registration is successfully opposed," the PTO shall register the trademark, issue a certificate of registration, and publish a notice of registration. 15 U.S.C. § 1063(b).

The Lanham Act also establishes processes for challenging and enforcing a trademark after the PTO has registered it on the principal register. Section 14 of the Lanham Act, codified at § 1064, permits individuals to initiate an administrative proceeding to challenge a registered mark. "Any person who believes that he is or will be damaged by the registration of a mark" may initiate an administrative process by "applying to cancel said registration … within five years from the date of the registration of the mark." 15 U.S.C. § 1064(a), (b). Alternatively, any such person may apply to cancel the registration "at any time if the registered mark becomes the common descriptive name of an article," the mark "has been abandoned or its registration was obtained fraudulently," or certain other circumstances arise. *Id.* § 1064(c).

The Lanham Act gives trademark holders various avenues to enforce a mark in court. Any person who uses any "reproduction, counterfeit, copy, or colorable imitation of a registered mark in

connection with the sale … distribution, or advertising of any goods" and "such use is likely to cause confusion, or to cause mistake, or to deceive" shall be "liable in a civil action by the registrant." 15 U.S.C. § 1114(1)(a). Similarly, "[a]ny person who, in connection with any goods or services, … uses in commerce any word, term, name, symbol, or device, or any combination thereof … which is likely to cause confusion … shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." *Id.* § 1125(a)(1)(A).

### B. Factual Background

Curtin is a professor of law focusing on intellectual property law but, more importantly, has been a longtime, avid collector of dolls and toy figures of fairy-tale characters. Appx266, Appx1424–57, Appx2128–51, Appx2640. As the mother of a young daughter, Curtin has purchased and continues to purchase dolls and toys, including those based on fairy-tale characters. Appx266, Appx1424–57, Appx2640–41. Among the dolls and toys Curtin has purchased and continues to purchase are those featuring the fairy-tale character Rapunzel. Appx266, Appx1569–1620, Appx2640–41. Indeed, as a longtime collector, Curtin has purchased approximately

eighteen Rapunzel-related items in the last eight years. Appx2640, Appx2665–90, Appx2393–96, Appx2722. Curtin is no ordinary consumer.

The tale and name of "Rapunzel" are well known. Appx262. The fairy tale can be traced back to the 1600s, with the Grimm Brothers being credited with the first published version of it. Appx262–63, Appx1411–12, Appx1414, Appx1779–89, Appx1944–46, Appx1948, Appx1950–58, Appx1960–72. The Grimm Brothers tell the story of a wicked sorceress taking possession of a newborn baby from a man and woman who were caught stealing from her. Appx1412, Appx1787–89. The sorceress names the baby Rapunzel, and when Rapunzel turns twelve years old, the sorceress locks her in a tower with a single tiny window near the top. *Id.* To enter the tower, the sorceress would entreat Rapunzel to let down the child's long golden hair, which the sorceress would climb. *Id.* Eventually, Rapunzel is rescued from the tower by a prince. *Id.*

Depictions and representations of Rapunzel are legion. Adaptions of the Rapunzel tale have appeared in literature and film, which have been marketed and promoted under the name "Rapunzel." Appx1411, Appx1414, Appx1949–72. Both Disney and Mattel have produced modern film adaptations of the fairy tale, including *Tangled* (2010) and *Barbie as*

*Rapunzel* (2002). Appx1411–12, Appx1737–47. Disney and Mattel also market and sell a variety of Rapunzel-themed dolls and merchandise using the name "Rapunzel." Appx264, Appx1413–15, Appx1867–1913. Many other dolls depicting the Rapunzel character are sold in commerce, Appx264, Appx1413–17, Appx1819–1931, including dolls sold by individuals on websites, such as Etsy or eBay, using the name "Rapunzel." Appx264, Appx1413–14, Appx1416–17, Appx1819–66, Appx1928–31. Collections of princess dolls and merchandise often include Rapunzel. Appx1413–14, Appx1416, Appx1914–31, Appx1949–72.

UTH is a company that sells dolls with long blonde hair under the name "Rapunzel," Appx1415, Appx1707–10, as well as other dolls based on other fairy-tale characters, Appx1414–15, Appx1417, Appx1677–78, Appx1702–06. In fact, Curtin has purchased dolls from UTH bearing the names "Zombie Snow White," "Zombie Sleeping Beauty," and "Zombie Princess Rapunzel." Appx2253–71, Appx2640–41, Appx2659–60, Appx2673.

### C. Proceedings Below

On November 20, 2017, UTH filed an application to register the mark RAPUNZEL, in standard characters, for dolls and toy figures. Appx2, Appx38–44. The PTO published the mark for opposition on April 10, 2018. *See* Appx45. On May 9, 2018, Curtin filed a notice of opposition to UTH's registration. Appx45–55. As amended, Curtin's notice of opposition showed that she falls within the "broad class of persons who are proper opposers" because she has "a belief that [she] would suffer some kind of damage if the mark is registered." *Ritchie v. Simpson*, 170 F.3d 1092, 1095 (Fed. Cir. 1999). She also demonstrated that she meets the "two judicially-created requirements in order to have standing"—namely, that she has "a 'real interest' in the proceedings" and has "a 'reasonable' basis for [her] belief of damage." *Id.*

In particular, Curtin showed that as a longtime collector of fairy-tale dolls, she has a legitimate interest in the outcome of the proceeding. She explained that if UTH were to obtain a trademark on the name of a famous fairy-tale character, consumers like her would be denied healthy marketplace competition for products bearing that name. Appx266; *see also* Appx2646. As a result, consumers will likely face an increased cost

of goods associated with Rapunzel merchandise. Appx266, Appx2646. And registering a trademark for that name would also chill the creation of new dolls and toys based on the fairy-tale character, reducing or eliminating the social benefit of having diverse interpretations of the character. Appx266; *see also* Appx2647. Curtin further demonstrated that her belief was reasonable. She had contact with several organizations and interest groups that had expressed their belief that allowing registration of the RAPUNZEL mark would cause damage. Appx266. Curtin obtained more than 400 petition signatures from a boutique seller and from collectors and other consumers, including over 150 in the United States, all of whom shared her beliefs. Appx266–67, Appx278–98, Appx2700–21, Appx2709.

Having shown her entitlement to oppose the registration of UTH's proposed trademark, Curtin argued that UTH's proposed mark fails to function as a trademark. Curtin explained that UTH seeks to register a mark that consists of a name with a pre-established value and meaning to consumers, who will recognize "Rapunzel" as the name of a fairy-tale character known in various forms for hundreds of years. Appx263–64. The proposed mark, therefore, merely informs consumers, and is a

generic descriptor or highly descriptive of UTH's goods. Appx263, Appx265. The proposed mark is also functional because the name "Rapunzel" on a doll elevates it over competing products by giving consumers important information about the product and because that name is the only moniker by which the well-known fairy-tale character can be identified. Appx265–66.

In response to Curtin's entrance into the proceeding, UTH moved to dismiss Curtin's opposition, contending that Curtin lacked standing to oppose registration. The Board denied the motion. It stated that Curtin had "sufficiently alleged that she has a direct and personal stake in the outcome of the proceeding and that her belief of damage has a reasonable basis in fact." Appx182; *see* Appx3.

After summary judgment briefing and approximately two years, however, the Board reversed course and denied Curtin's motion for summary judgment by questioning her entitlement to oppose UTH's registration. Appx3. The Board then *sua sponte* bifurcated the proceeding "into 'two separate trial phases,'" Appx1, with the first phase focused on Curtin's "entitlement to bring a statutory cause of action." Appx4. After

proceedings on the first phase, the Board concluded that Curtin lacked the statutory right to oppose registration and dismissed the opposition.

According to the Board, the "essential problem is that mere consumers such as [Curtin] are generally not statutorily entitled to oppose registration under 15 U.S.C. § 1063." Appx6. The Board explained that "[e]ntitlement to the statutory cause of action … is a requirement in every inter partes case." Appx5. And looking to the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)—which addressed 15 U.S.C. § 1125—and this Court's decision in *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298 (Fed. Cir. 2020)—which addressed 15 U.S.C. § 1064—the Board concluded that a "plaintiff may oppose registration of a mark when doing so is within the zone of interests protected by the statute and she has a reasonable belief in damage that would be proximately caused by registration of the mark." Appx5.

Looking to *Lexmark*, the Board further stated that whether a plaintiff comes within the zone of interests of a statute rests on whether a legislatively conferred cause of action encompasses a particular plaintiff's claim. Appx6. Despite the broad language of § 1063, the Board

determined that the provision should not be given an expansive reading. *Id.* Rather, the Board must look to the interests protected by the law invoked—namely, the Lanham Act as a whole. Appx7. And on that point, the Board continued, the Court in *Lexmark*—which addressed § 1125, not § 1063—has already addressed those interests: "the Trademark Act regulates commerce and protects plaintiffs with commercial interests." Appx7. The Board stated that *Lexmark* held "'a plaintiff must allege an injury to a commercial interest in reputation or sales'" to come within the zone of interests of § 1125(a)(1) of the Lanham Act, Appx8, and asserted "[t]here is no question that *Lexmark*'s holdings on entitlement to a statutory (Trademark Act) cause of action apply to opposition proceedings such as this one" under § 1063. Appx10. The Board thus concluded that "a mere consumer that buys goods or services is not under the Trademark Act's aegis" for opposition proceedings under § 1063. Appx10. A "statutory cause of action is reserved for those with commercial interests." Appx11.

The Board also determined that a person opposing a registration "'must show economic or reputational injury flowing directly from'" the registration. Appx11. The Board indicated that an injury intervening

party—i.e., "a fellow commercial actor"—is too remote to show proximate causation. Appx12. Based on that view of proximate cause, the Board determined that Curtin's "limited evidence" showed the damage to her was "too remote." *Id.*

In footnotes, the Board briefly addressed its prior ruling finding that Curtin had standing to oppose registration and this Court's decision in *Ritchie*, which squarely addresses opposer standing under Section 13 of the Lanham Act. The Board stated that its prior decision rested largely on this Court's decision in *Ritchie*, and underlying that case was the bar on registering "immoral" and "scandalous" matter. Appx3, Appx7. The Board suggested that it could ignore *Ritchie* because, six months after denying UTH's motion to dismiss, the Supreme Court found the bar on registering "immoral" or "scandalous" matter unconstitutional. Appx3. The Board further asserted that Curtin's opposition did not invoke the same interests as the opposer in *Ritchie*. Appx7. With those observations, the Board said nothing more about *Ritchie* or its prior determination.

The Board dismissed Curtin's opposition, and Curtin appealed to this Court. Appx2781–83.

## SUMMARY OF ARGUMENT

The Board committed fundamental legal errors in concluding that Curtin is not entitled to oppose UTH's registration of the mark RAPUNZEL. This Court in *Ritchie* articulated the standards necessary for someone to oppose the registration of a trademark. As an administrative proceeding, a trademark opposition is not subject to the requirements that apply to a case in federal court, including prudential standing requirements, of which the zone-of-interests test is one. Rather, the starting point for determining whether a person may oppose registration is the language of Section 13 of the Lanham Act. Curtin easily satisfies that. She is a person "who believes that [s]he would be damaged by the registration of a mark." 15 U.S.C. § 1063. She demonstrated her belief that, as a long-time collector of Rapunzel dolls, she would be damaged from the harm to competition for Rapunzel dolls, face increased costs of Rapunzel dolls, and lose the diversity of Rapunzel dolls from various producers.

In *Ritchie*, the Court also explained that those who oppose a trademark registration must also satisfy two other requirements. An opposer must have a real interest in the proceeding and have a

reasonable basis for the opposer's belief. Yet again, Curtin showed that she easily cleared these hurdles. As a long-time consumer of Rapunzel dolls, Curtin demonstrated that UTH's trademark would deprive consumers like her of healthy marketplace competition for Rapunzel products. As a result, collectors like Curtin would face increased costs for goods associated with Rapunzel products, as well as the loss of diverse interpretations of the fairy-tale character. And Curtin showed her belief is reasonable. Several organizations and interest groups expressed belief that registering the trademark RAPUNZEL would cause damage. Moreover, Curtin submitted over 400 petition signatures from individuals, including over 150 in the United States, who shared her belief in the harm that would arise from UTH's registration.

Rather than assess Curtin's entitlement to oppose UTH's registration according to the language of Section 13 and the Court's instruction in *Ritchie*, the Board struck out on its own path. It did so by adopting the framework from *Lexmark*, requiring an opposer to show its interests fall within the zone of interests protected by the statute and that her injury is proximately caused by a violation of the statute. The Board erred in adopting the *Lexmark* framework. The Supreme Court in

*Lexmark* explained that the framework it announced applies to causes of action in court. But Section 13 does not provide a cause of action; it provides for an administrative proceeding. And courts have long recognized that "[j]udicially-devised prudential standing requirements, *of which the 'zone of interests' test is one*, are … *inapplicable to an administrative agency*." *Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n*, 194 F.3d 72, 75 (D.C. Cir. 1999) (emphases added). Indeed, *Ritchie* relied on the distinction between agency and court proceedings in announcing the governing standards for opposing registration under Section 13. *See* 170 F.3d at 1094. The Board erred in failing to follow *Ritchie* and disregarding the plain terms of Section 13.

Even if the *Lexmark* framework did apply to oppositions under Section 13, however, the Board further erred in concluding that Curtin does not satisfy it. The Board first concluded that the interests of a consumer like Curtin do not fall within the zone of interests protected by the Lanham Act. However, the Board merely adopted wholesale the Supreme Court's discussion of the false-advertising claim at issue in *Lexmark*. That was error. Nowhere in *Lexmark* did the Court suggest it was opining broadly about all interests that might come within the zone

of interests protected by the Lanham Act. To the contrary, the Court stated that the breadth of the zone of interests varies according to the provisions at issue. And a consumer's interest in preventing the registration of a generic trademark falls well within the zone of interests protected by Section 13. The Lanham Act—and trademark law in general—have long sought to protect consumers. And granting an exclusive right to use a generic trademark would harm competition and damage the interests of consumers. There is no basis for the Board's determination that only commercial interests count for opposition proceedings.

The Board further erred in determining that Curtin's injuries would not be proximately caused by the registration of a generic trademark. Once again adopting the Court's reasoning in *Lexmark* wholesale, the Board indicated that an opposer must show no intervening injury to another in order to satisfy the proximate-cause standard. But the Supreme Court stated that "an intervening step" of injury to another "is not fatal to the showing of proximate causation required." *Lexmark*, 572 U.S. at 133. The standard adopted by the Board cannot be squared with *Lexmark*. And Curtin has a "sufficiently close connection to the

conduct the statute prohibits," which is all that is required. *Id.* Indeed, courts have recognized that "trademarking of generic terms would impose excessive costs of information on ... consumers and is therefore forbidden." *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996).

Curtin satisfies the plain terms of Section 13, as well as the requirements *Ritchie* laid down. Moreover, Curtin falls within the zone of interests protected by Section 13, and the harm she seeks to prevent is closely connected to what the Lanham Act prohibits. Accordingly, Curtin is entitled to oppose UTH's registration.

## ARGUMENT

### I. STANDARD OF REVIEW

"Where entitlement" to oppose a trademark registration "turns on statutory interpretation," this Court "reviews the question de novo." *Empresa Cubana Del Tabaco v. General Cigar Co.*, 753 F.3d 1270, 1274 (Fed. Cir. 2014).

### II. CURTIN IS ENTITLED TO OPPOSE REGISTRATION UNDER SECTION 13 OF THE LANHAM ACT.

Curtin satisfies the conditions Congress established in Section 13 of the Lanham Act and is therefore entitled to oppose UTH's registration.

In *Ritchie*, this Court explained the distinction between entitlement to pursue cases in federal court and entitlement to participate in agency proceedings. The "'case' and 'controversy' restrictions for standing do not apply to matters before administrative agencies and boards, such as the PTO," this Court stated in *Ritchie*. 170 F.3d at 1094. Collecting administrative law cases, the Court noted that "'[a]dminstrative adjudications … are not an article III proceeding to which either the 'case or controversy' or *prudential standing* requirements apply.'" *Id.* (quoting *Ecee, Inc. v. Federal Energy Regulatory Comm'n*, 645 F.2d 339, 349–50 (5th Cir. 1981)) (emphasis added).

Rather than Article III or prudential standing requirements, "the starting point for a standing determination for a litigant before an administrative agency … is the statute that confers standing before that agency." *Ritchie*, 170 F.3d at 1095. Section 13 provides that "[a]ny person who believes that he would be damaged by the registration of a mark … may … file an opposition in the Patent and Trademark Office, stating the grounds therefor." 15 U.S.C. § 1063. This provision, this Court explained, "establishes a broad class of persons who are proper opposers; by its terms the statute only requires that a person have a belief that he would

suffer some kind of damage if the mark is registered." *Ritchie*, 170 F.3d at 1095.

And Curtin soared well over this low hurdle. She demonstrated her belief that she would be damaged by UTH's registration of RAPUNZEL because that registration would harm competition for dolls based on that fairy tale, increase the cost of Rapunzel dolls, and chill the creation of new Rapunzel dolls. Appx266–67, Appx2646–47.

In *Ritchie*, this Court explained that an opposer under Section 13 must also "meet two judicially-created requirements" established by the Federal Circuit's predecessor court, the Court of Customs and Patent Appeals ("CCPA"). 170 F.3d at 1095. The "opposer must have [1] a 'real interest' in the proceedings and must have [2] a 'reasonable' basis for his belief of damage." *Id.* The "real interest" requirement mandates that the opposer have "a legitimate personal interest in the opposition," i.e., a "personal stake in the outcome." *Id.* The "reasonable basis" requirement means that the belief in damage "have a 'reasonable basis in fact.'" *Id.* at 1098. This "may be shown in several ways," including by alleging "that others also share the same belief" and supporting that with "evidence … in the form of surveys or petitions." *Id.*

Here again, Curtin more than satisfied these two standards. Curtin demonstrated that she has a legitimate interest in the outcome of the opposition proceeding as a longtime collector of fairy-tale dolls, and Rapunzel dolls in particular. Appx266, Appx2641–46. Curtin explained that registering UTH's trademark on RAPUNZEL would deprive consumers like her of healthy marketplace competition for products bearing that name. Appx266, Appx2646–47. As a result, consumers will likely face increased costs for goods associated with Rapunzel merchandise. Moreover, registering a trademark on the name Rapunzel would chill the creation of new dolls and toys based on that fairy-tale character, diminishing the social benefit of having diverse interpretations of the character. Appx266.

Curtin also established that her belief was reasonable. She showed that several organizations and interest groups had expressed their belief that allowing registration of RAPUNZEL would cause damage. Appx266–67. Additionally, Curtin provided 157 petition signatures from individuals in the United States—including collectors, other consumers, and even a boutique seller—who shared her belief in the damage that

would result from UTH's registration of RAPUNZEL. *Id.*; *see also* Appx278–98, Appx2647, Appx2700–21, Appx2709.

Under the plain terms of Section 13 of the Lanham Act and this Court's governing precedent in *Ritchie*, Curtin is entitled to oppose UTH's registration of RAPUNZEL.

## III. THE BOARD ERRED IN CONCLUDING CURTIN IS NOT ENTITLED TO OPPOSE REGISTRATION.

The Board said nothing about the fact that Curtin satisfies the plain terms of Section 13. Nor did the Board address the fact that Curtin satisfies the governing standard for opposing the registration of a trademark under this Court's decision in *Ritchie*. Instead, the Board charted its own course in concluding that Curtin had no entitlement to oppose registration, determining that the framework from *Lexmark* governed and led to dismissal of the opposition. The Board erred by failing to follow the plain language of Section 13 and this Court's precedents, and the Board's errant reasoning does not withstand scrutiny. The *Lexmark* framework does not govern agency opposition proceedings and, even if it did, the Board misapplied that framework.

### A. The Board Erred by Imposing the *Lexmark* Framework on Agency Opposition Proceedings.

In reaching its conclusion, the Board wholesale adopted the framework from the Supreme Court's decision in *Lexmark* and determined that, in order to oppose a trademark registration under Section 13, an opposer must show she is entitled to a statutory cause of action by demonstrating she falls within the zone of interests protected by the statute. Appx5. This was error.

In *Lexmark*, the Supreme Court addressed "whether … Static Control Components, Inc., may sue … Lexmark International, Inc." in federal court "for false advertising under the Lanham Act, 15 U.S.C. § 1125(a)." *Lexmark*, 572 U.S. at 120. The Court explained that the question in the case turned on "whether Static Control falls within the class of plaintiffs whom Congress has authorized to sue under § 1125(a)." *Id.* at 128. And, according to the Court, "a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Id.* at 129. As the Court expounded, the "'zone of interests' formulation originated … as a limitation on the cause of action for judicial review conferred by the Administrative Procedure Act." *Id.*

Section 13 of the Lanham Act, however, does not provide a cause of action in court; it establishes the basis for "[a]ny person" to oppose registration of a trademark in an administrative proceeding before an agency. 15 U.S.C. § 1063. The distinction between participation in an administrative proceeding and a private right of action in court is critical. "'[I]t is well settled that there are wide differences between administrative agencies and courts.'" *FDRLST Media, LLC v. NLRB*, 35 F.4th 108, 119 (3d Cir. 2022) (quoting *Shepard v. NLRB*, 459 U.S. 344, 351 (1983)). "Judicially-devised prudential standing requirements, *of which the 'zone of interests' test is one*, are … *inapplicable to an administrative agency* acting within the jurisdiction Congress assigned to it." *Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n*, 194 F.3d 72, 75 (D.C. Cir. 1999) (emphases added); *FDRLST Media*, 35 F.4th at 119 (same); *see Fund Democracy, LLC v. SEC*, 278 F.3d 21, 27 (D.C. Cir. 2002) (explaining that agencies "may permit persons to intervene in the agency proceedings who would not have standing to seek judicial review of the agency action").[1]

[1] The Supreme Court and this Court have recently emphasized the distinction between agencies and courts in analogous circumstances. In discussing *inter partes* review proceedings, the Supreme Court explained

This Court in *Ritchie* relied on this very distinction between courts and agencies in explaining the appropriate test for a person to oppose the registration of a trademark. Collecting authorities, the Court noted that "'[a]dministrative adjudications … are not an article III proceeding to which either the "case or controversy" *or prudential standing requirements* apply.'" *Ritchie*, 170 F.3d at 1094 (emphasis added).[2] Accordingly, this Court held that for Section 13, a person need only show "a belief that he would suffer some kind of damage if the mark is registered," "have a 'real interest in the proceedings,'" and "have a 'reasonable' basis for his belief of damage." *Id.* at 1095.

---

that "inter partes review is less like a judicial proceeding and more like a specialized agency proceeding. Parties that initiate the proceeding need not have a concrete stake in the outcome; indeed, they may lack constitutional standing." *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 279 (2016); *AVX Corp. v. Presidio Components, Inc.*, 923 F.3d 1357, 1361 (Fed. Cir. 2019) ("A person does not need to have Article III standing to file an IPR petition and obtain a Board decision, because Article III requirements do not apply to administrative agencies.").

[2] In *Lexmark*, the Supreme Court indicated that "prudential standing" is not the appropriate moniker. Nonetheless, the Court acknowledged that the "zone-of-interests test" has been placed "under the 'prudential' rubric in the past." 572 U.S. at 127. Accordingly, cases predating *Lexmark* may use the term "prudential standing," but still stand for the proposition that the zone-of-interest test is inapplicable to agency proceedings.

The Board fundamentally erred in concluding that the zone-of-interests test for causes of action in federal court applied to an administrative proceeding under Section 13. And the Board further erred by flatly disregarding this Court's decision in *Ritchie*, which directly addressed the requirements for demonstrating an entitlement to oppose a trademark registration and is controlling authority. The Board may disregard controlling authority from this Court in only "two narrow" circumstances: "if the circuit's precedent is expressly overruled by statute or by a subsequent Supreme Court decision." *Strickland v. United States*, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005). "Neither occurred here." *Id.*

The Board attempted to sidestep the Court's decision in *Ritchie*, Appx3, Appx7, but that effort does not withstand scrutiny. The Board threw off *Ritchie* by noting that the Supreme Court had found unconstitutional "the bar on registration of 'immoral' and 'scandalous' matter"—which was the basis on which the mark underlying *Ritchie* had been challenged. Appx3. But that legal development had no impact on this Court's articulation of the general framework in *Ritchie* for assessing whether a person may oppose registration of a trademark under Section 13. *Ritchie* makes clear that the standards for opposing a trademark are

distinct from those governing lawsuits in court. 170 F.3d at 1094–95. And this Court held that a person need only satisfy the language of Section 13, as well as the "real interest" and "reasonable" basis requirements. *Id.* at 1095. No Supreme Court decision has "expressly overruled" this aspect of *Ritchie*. *Strickland*, 423 F.3d at 1338 n.3.

The Board also indicated that it disregarded *Ritchie* because of "updates to the 'standard for determining whether a party is eligible to bring a statutory cause of action.'" Appx4. But the only updates it cited are those concerning the framework established by *Lexmark*. As explained above, *Lexmark* concerns the standards for maintaining a statutory cause of action in federal court; it did not address the standards for participating in an administrative proceeding, like the opposition proceeding here. And nothing in *Lexmark* or its progeny "expressly overruled" *Ritchie*. *Strickland*, 423 F.3d at 1338 n.3; *see Bankers Trust New York v. United States*, 225 F.3d 1368, 1376 (Fed. Cir. 2000) (explaining that no "executive branch agency [has] the power to overrule an established statutory construction of the court."). The Board erred in disregarding this Court's governing authority and charting its own course.

The Board also relied on this Court's decision in *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298 (Fed. Cir. 2020), in concluding that the *Lexmark* framework should apply. Appx5. But *Corcamore* does not get the Board to the result it reached. In *Corcamore*, the Court addressed § 1064, which permits any person to initiate a proceeding with the PTO to cancel a trademark that has already been registered within five years from the date of registration, or within certain prescribed time periods. 15 U.S.C. § 1064(1)–(6). This Court concluded that *Lexmark*'s framework applied to cancellation proceedings under § 1064 because that provision, according to the Court, is a "cause of action"—that is, it provides "one or more bases for suing." 978 F.3d at 1304 (quoting *Black's Law Dictionary*).

Appellant submits that—although it does not ultimately matter—*Corcamore*'s conclusion that a cancellation proceeding is a "cause of action" subject to the *Lexmark* framework is incorrect. Indeed, the *Black's Law Dictionary* relied on in *Corcamore* makes clear that a "cause of action" is limited to proceedings "in court." *Cause of Action*, Black's Law Dictionary (11th ed. 2019) ("bases for suing"; a situation entitling a person "to obtain a remedy *in court* from another person"). Even early definitions of the term tie it to court proceedings, defining it as "a

situation or state of facts that entitles a party to maintain an action in a *judicial tribunal*." *Id.* (quoting Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 170 (2d ed. 1899)). Moreover, it appears that the *Corcamore* panel did not have any briefing that alerted it to the case law holding that "[j]udicially-devised prudential standing requirements, of which the 'zone of interests' test is one, are … inapplicable to an administrative agency acting within the jurisdiction Congress assigned to it." *Envirocare*, 194 F.3d at 75.

But ultimately, *Corcamore*'s conclusion that a cancellation proceeding under § 1064 is a "cause of action" did not make a difference to the result in *Corcamore*, which upheld the petitioner's right to initiate a cancellation proceeding in spite of that conclusion. And that conclusion does not make a difference to the result here, since *Corcamore* was a case about § 1064 and therefore cannot control this case involving § 1063 in view of this Court's decision in *Ritchie*.

In addition, there are significant reasons for concluding that even if a cancellation proceeding under § 1064 constitutes a "cause of action," an opposition proceeding under § 1063 does not, consistent with the holding in *Ritchie*. For example, § 1064 permits a person to initiate an

entirely new proceeding to seek relief. 15 U.S.C. § 1064 (permitting a "petition to cancel a registration of a mark"). Initiating an entirely new proceeding against a registered trademark holder might be viewed as a form of "suing" the trademark holder. Section 13, by contrast, does not provide a basis for a person to initiate a proceeding, i.e., to "sue" a trademark holder. Rather, Section 13 allows a person to participate in an ongoing administrative process—a process that began when an application for registration was filed and that is not completed until the registration has been granted or denied.

Specifically, an applicant files for registration of a trademark, and after an initial examination, the examiner causes the mark to be published in the Official Gazette. 15 U.S.C. § 1062(a). A person has 30 days from publication to then "file an opposition in the Patent and Trademark Office." *Id.* § 1063(a). Only after any opposition proceeding has concluded will the trademark "be registered in the Patent and Trademark Office." *Id.* § 1063(b); *see* 3 J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 20:2 (5th ed.) ("the opposition procedure allows anyone who may be damaged by a registration to challenge the application even before it is finally and officially given

federal sanction and the benefits of Lanham Act registration”). Accordingly, an opposition proceeding is akin to submitting comments during a rulemaking or adjudication, which generally permit any “interested persons” to participate. 5 U.S.C. § 553(c); *id.* § 554(c).

In summary, opposition proceedings under Section 13 of the Lanham Act are not causes of action subject to judicial restrictions, but rather an opportunity for certain persons to participate in the administrative process of registering a trademark, as this Court held in *Ritchie*. The Board erred in simply adopting the *Lexmark* framework and disregarding this Court’s governing case law.

### B. Even Under the *Lexmark* Framework, the Board Erred in Concluding that Curtin Is Not Entitled to Oppose Registration.

Even if the Board properly adopted the *Lexmark* framework for opposition proceedings—and it did not—the Board erred in concluding that Curtin is not entitled to oppose UTH’s registration. In *Lexmark*, the Supreme Court explained that entitlement to a statutory cause of action rests on two principles: the plaintiff’s interests should fall within the zone of interests protected by the law invoked and the plaintiff’s injuries should be proximately caused by violations of the statute. 572 U.S. at

129–30, 132. The Board concluded that a consumer like Curtin did not fall within the zone of interests protected by Section 13 and that the damage Curtin seeks to avoid is too remote to be proximately caused by violations of the statute. The Board was wrong on both accounts.

### 1. The Board Erred in Concluding Curtin's Interests Do Not Fall within the Zone of Interests Protected by Section 13.

The Board determined that "a consumer of fairytale-themed products" like Curtin does not fall within the zone of interests protected by § 1063 because "a statutory cause of action is reserved for those with commercial interests." Appx10–11. The Board's erroneous determination rests on a misunderstanding of *Lexmark*.

In *Lexmark*, the Supreme Court addressed whether Static Control's false-advertising claim fell within the zone of interests of § 1125(a). In identifying interests protected by the Lanham Act, the Court looked at the statute's expressly stated purposes in 15 U.S.C. § 1127 and determined that only one of those purposes applied in a false-advertising case: "a typical false-advertising case will implicate only the Act's goal of 'protect[ing] persons engaged in [commerce within the control of Congress] against unfair competition." 572 U.S. at 131. The Court

reasoned further that, while unfair competition was an elastic concept at common law, "it was understood to be concerned with injuries to business reputation and present and future sales." *Id.* Thus, "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 131–32.

Based on the Supreme Court's discussion of the purposes in § 1127 and analysis of the false-advertising claim at issue there, the Board concluded here that the same commercial interest is necessary to oppose registration under § 1063. Appx7–10; Appx10 ("There is no question that *Lexmark*'s holdings on entitlement to a statutory (Trademark Act) cause of action apply to opposition proceedings such as this one."). That was error.

The Supreme Court in *Lexmark* nowhere suggested that it was opining broadly about all interests that might fall within the zone of interests protected by all provisions of the Lanham Act. Quite the contrary, the Court emphasized that "'the breadth of the zone of interests varies according to the provisions of law at issue.'" *Lexmark*, 572 U.S. at 130 (quoting *Bennett v. Spear*, 520 U.S. 154, 163 (1997)). And oppositions

to registration under § 1063 are not limited to false-advertising concerns or unfair competition. Rather, they concern whether trademark protections should be granted in the first place.

A consumer's interest in preventing the registration of a generic term falls well within the zone of interests protected by § 1063, especially those of a long-time collector of goods sold in association with the generic term. *Lexmark* considered only one of the purposes listed in 15 U.S.C. § 1127—the purpose applicable to the Lanham Act's false-advertising provision. But another of the purposes listed in 15 U.S.C. § 1127 indicates Congress's intent "to regulate commerce … by making actionable the deceptive and misleading use of marks in … commerce." 15 U.S.C. § 1127. That particular interest is intimately tied to protecting consumers. "From its earliest beginnings in legal history, trademark law has had the dual goals of both protecting property in a trademark and *protecting consumers* from confusion and deception." 1 *McCarthy on Trademarks and Unfair Competition* § 2:22 (5th ed.) (emphasis added). Indeed, the Supreme Court has remarked that a core purpose of the Lanham Act is "to protect the ability of *consumers* to distinguish among competing producers." *Park 'n Fly, Inc. v. Dollar Park & Fly, Inc.*, 469

U.S. 189, 198 (1985) (emphasis added) (citing S. Rep. No. 1333, at 3, 5). The Senate Report indicates further that a purpose of the Lanham Act "is *to protect the public* so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get." S. Rep. No. 1333, 79th Cong. 2d Sess. (1946) (emphasis added). Protecting consumers unquestionably falls within the zone of interests protected by the non-false-advertising provisions of the Lanham Act.

Consumer interest in preventing generic trademarks, moreover, is in perfect sync with trademark law. "Sharing in the goodwill of an article unprotected by patent or trademark is the exercise of a right *possessed by all*—and in the free exercise of which the consuming *public* is deeply interested." *Kellogg v. Nat'l Biscuit Co.*, 305 U.S. 111, 122 (1938) (emphases added). Granting "an exclusive right to … use … the generic name of a product would be equivalent to creating a monopoly in that particular product, something that the trademark laws were never intended to accomplish." 2 *McCarthy on Trademarks and Unfair Competition* § 12:2 (5th ed.); *see CES Publishing Corp. v. St. Regis Publications*, 531 F.2d 11, 13 (2d Cir. 1975) (Friendly, J.). A consumer's

interest in preventing the registration of a generic term, therefore, falls squarely within the interests protected by the non-false-advertising provisions of the Lanham Act.

The Board stated that an opposer must have an injury to a commercial interest in order to fall within the Lanham Act's zone of interests. Appx8. But that rested entirely on the *Lexmark* discussion of false-advertising cases and the nature of "unfair competition" claims. *Id.* The purposes of the rest of the Lanham Act go well beyond competitors. Indeed, the Act's grounds for refusing to register a trademark demonstrate that the Act is concerned with more than injury among competitors. For instance, as originally enacted, the Lanham Act refused registration of marks that consisted of or comprised "immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols." 15 U.S.C. § 1052(a). The Act further refuses registration of trademarks consisting of or comprising "the flag or coat of arms or other insignia" of a country, state, or municipality. *Id.* § 1052(b). These bases for refusing to register a mark demonstrate that commercial interests are not the only interests that matter.

Even when this Court applied *Lexmark* to cancellation proceedings under § 1064 in *Corcamore*, it recognized that a "commercial interest" was only *one* way, not the *only* way, to satisfy the zone-of-interests test. *Corcamore*, 978 F.3d at 1305–06 ("[L]ike the zone-of-interests test, a petitioner *can* satisfy the real-interest test by demonstrating a commercial interest."). The Board did not provide any reason why a "commercial interest" should be required for § 1063 when it is not required under *Corcamore* for § 1064. Indeed, this Court in *Corcamore* stated that it saw "no meaningful, substantive difference" between the "real interest" test and the zone-of-interests test from *Lexmark*, so that "a party that demonstrates a real interest in cancelling a trademark under § 1064 has demonstrated an interest falling within the zone of interests protected by § 1064." *Id.* at 1305, 1306. Likewise, if *Lexmark* is applicable to § 1063, parties that demonstrates a "real interest" in opposing a trademark have also demonstrated that they fall within the zone-of-interests for § 1063.

Here, Curtin has a specific and personalized interest in preventing UTH from registering the generic mark RAPUNZEL for fairy-tale dolls. As a longtime, avid purchaser and collector of fairy-tale dolls, and

Rapunzel dolls in particular, Curtin demonstrated a specific interest in preventing UTH from depriving consumers like her of healthy marketplace competition for Rapunzel dolls. If UTH were allowed to register its generic mark, consumers would likely face increased costs for goods associated with Rapunzel merchandise. And allowing the generic mark would chill the creation of new dolls and toys based on that fairy-tale character. The fact that Curtin does not have a commercial interest is not dispositive. Her individual interest is consistent with and within the zone of interests protected by the Lanham Act and opposition proceedings in particular. *See Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 147 (2d Cir. 2003) ("[A] merchant who sells pencils under the trademark Pencil or Clear Mark, for example, and seeks to exclude other sellers of pencils from using those words in their trade, is seeking an advantage the trademark law does not intend to offer. To grant such exclusivity would deprive the consuming public of the useful market information it receives where every seller of pencils is free to call them pencils.").

Ultimately, a consumer such as Curtin seeking to oppose the registration of a generic mark falls within the zone of interests protected

by Section 13 of the Lanham Act. The Board erred in concluding otherwise.

### 2. The Board Erred in Concluding Curtin's Injuries are not Proximately Caused by the Alleged Violation.

The Board further erred in concluding that Curtin failed to satisfy the proximate cause requirement of the *Lexmark* framework. The Board concluded that Curtin had to "'show economic or reputational injury flowing *directly* from' [UTH's] registration of RAPUNZEL." Appx11 (quoting *Lexmark*) (emphasis added). Then, adopting the discussion of the Supreme Court's discussion of the false-advertising claim in *Lexmark*, the Board parroted that the proximate cause showing "'is generally not made when' a defendant's conduct 'produces injuries to a fellow commercial actor that in turn affect the plaintiff." Appx12. Under that standard, the Board determined that Curtin's evidence was too "limited" and the damage "too remote." *Id.* The conclusion is riddled with errors.

First, the Board's requirement of a direct "economic or reputational injury" appears to be derived from its zone-of-interest determination that injury must be "'to a commercial interest in reputation or sales.'" Appx8.

As explained above, opposition proceedings under Section 13 of the Lanham Act have a broader zone of interests than commercial ones. *See supra*, pp. 34–40.

Second, and more fundamentally, the Board misinterpreted *Lexmark* in concluding that an injury must flow "directly" from UTH's registration, i.e., that an intervening injury to another renders an opposer's injury too indirect to satisfy proximate cause, and that, based on that view, Curtin had not provided sufficient evidence to show proximate causation. Appx12. The Board's conclusions rest on its erroneous view of the proximate causation standard.

In *Lexmark*, the Supreme Court explained that the proximate-cause "analysis is controlled by the nature of the statutory cause of action" and the question turns on "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." 572 U.S. at 133. According to the Court, a harm may often be too remote "if the harm is purely derivative of 'misfortunes visited upon third persons by the defendant's act." *Id.* The Court clarified, however, that some level of intervening injury on another does not automatically eliminate proximate cause. The Court explained that "all commercial injury from

false advertising"—which was the claim at issue in *Lexmark*—"are derivative of those suffered by consumers." *Id.* Yet, "the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute." *Id.* Indeed, the Court held that the economic or reputational injury necessary for a false-advertising claim under § 1125(a) is shown "when deception of consumers causes them to withhold trade from the plaintiff." *Id.* Thus, the Board's determination that proximate cause requires no intervening injury is wrong.

Instead, *Lexmark* requires merely that "the harm alleged has a sufficiently close connection to the conduct the statute prohibits." 572 U.S. at 133; *see also Carter v. McDonough*, 46 F.4th 1356, 1360 (Fed. Cir. 2022) ("Proximate cause does not require that the cause be the last link in the causal chain, nor is it necessarily extinguished due to the intervening acts of others. Rather, it 'limits legal responsibility to those [but-for] causes which are so closely connected with the result ... that the law is justified in imposing liability.'" (citations omitted and internal quotation marks omitted)).

Here, the harms to Curtin are closely connected to the conduct the statute prohibits, as *Lexmark* requires. Curtin seeks, among other

things, to oppose UTH's registration of RAPUNZEL as descriptive, generic, or functional, which are specific grounds for refusal under 15 U.S.C. § 1052(e). As Curtin explained, allowing UTH to register a generic or descriptive mark would likely deny consumers healthy marketplace competition for Rapunzel products. This could increase the costs associated with Rapunzel merchandise, chill the creation of new dolls, and diminish diverse interpretations of the character.

Such harms are closely linked to the Lanham Act's bar on generic marks. As courts have recognized, "[t]o allow trademark protection for generic terms, … even when these have become identified with a first user, would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are." *CES Pub. Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13 (2d Cir. 1975). Moreover, courts have explained that the "trademarking of generic terms would impose excessive costs of information on competitors and *consumers* and is therefore forbidden." *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996) (emphasis added). And, as the Supreme Court has recognized, the distortion of competition occurs "not merely by successful suit but by the plausible threat of successful suit." *Wal-Mart*

*Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 214 (2000).[3] Therefore, Curtin seeks to avoid the very harms courts have recognized would occur if a generic mark is registered.

The fact that Curtin's harms rest on intervening harms to UTH's competitors does not make her harms "too remote." Appx12. Just as "the intervening step of consumer deception is not fatal" to a plaintiff pursuing a false-advertising claim, *Lexmark*, 572 U.S. at 133, the intervening step of damage to competition does not mean Curtin's injury would not be proximately caused by the registration of a generic mark. Courts have long recognized the restraint to competition of a generic trademark, and Curtin amply supported a reasonable basis to believe sellers would be injured and that she would be injured as a result. *See, e.g.*, Appx2705 ("If granted it will stop others from being able to compete fairly in the toy industry."); Appx2709 ("I have a small doll boutique and

---

[3] The Board faulted Curtin by asserting that she "merely assumes that, notwithstanding" defenses available to a registrant, UTH "will be so successful in enforcing its asserted rights that it will reduce 'market place competition.'" Appx12. As noted above, the Board's ruling on Curtin's evidentiary showing stems from its erroneous proximate-cause standard. But, even on its own terms, the Board's assertion is misguided. As the Supreme Court's *Wal-Mart* decision makes clear, a trademark may distort competition "not merely by successful suit but by the plausible threat of successful suit." *Wal-Mart Stores*, 529 U.S. at 214.

I am currently offering Rapunzel dolls to customers at affordable prices. I believe this Trademark could damage my business."); Appx2710 (noting trademark will be "[d]riving up costs and reducing quality for all of us"); Appx2712 ("as a low budget doll lover this would affect me greatly"); Appx2712 ("It will reduce the number dolls release with the same and increase the price …."); Appx2715 (trademark "would have a negative effect on creators, companies, and consumers outside of that specific company"); Appx2719 ("fear of a monopoly in my hobbie [sic] of collecting dolls").

* * * * *

Because Curtin falls within the zone of interests protected by Section 13 of the Lanham Act and because the harm Curtin seeks to prevent is closely connected to what the Lanham Act prohibits, Curtin is entitled to oppose UTH's registration even if the *Lexmark* framework is applicable to proceedings under Section 13.

## CONCLUSION

For the foregoing reasons, the Court should reverse and remand for further proceedings.

Date: November 20, 2023

Respectfully submitted,

/s/ Matthew A. Barlow
JOHN C. STRINGHAM
MATTHEW A. BARLOW
DAVID R. TODD
RYAN C. MORRIS
WORKMAN NYDEGGER
60 E. South Temple St., Ste. 1000
Salt Lake City, UT 84111
(801) 533-9800

*Counsel for Appellant Rebecca Curtin*

# ADDENDUM

This Opinion is a
Precedent of the TTAB

Hearing: November 15, 2022 Mailed: May 4, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

Trademark Trial and Appeal Board

*Rebecca Curtin*

*v.*

*United Trademark Holdings, Inc.*

Opposition No. 91241083

John C. Stringham and Matthew A. Barlow of Workman Nydegger
for Rebecca Curtin.

Erik M. Pelton of Erik M. Pelton & Associates PLLC
for United Trademark Holdings, Inc.

Before Adlin, Lynch and Dunn, Administrative Trademark Judges.

Opinion by Adlin, Administrative Trademark Judge:

The Board, *sua sponte*, bifurcated this case into "two separate trial phases." 49 TTABVUE 6-7.[1] The first trial phase concerned, and this decision addresses, only "Opposer's entitlement to a statutory cause of action." *Id.*

[1] Citations to the record are to TTABVUE, the Board's online docketing system. Specifically, the number preceding "TTABVUE" corresponds to the docket entry number(s), and any number(s) following "TTABVUE" refer to the page number(s) of the docket entry where the cited materials appear.

More specifically, we address a single, threshold question: is Opposer Rebecca Curtin, as a purchaser of goods bearing the challenged mark, entitled to oppose the mark's registration under Section 13 of the Trademark Act, 15 U.S.C. § 1063, when she alleges the proposed mark is both invalid and the subject of a fraudulent application? Because our answer to this question is "no," we dismiss the opposition and do not reach the second (merits) trial phase.

## I. The Pleadings

Applicant United Trademark Holdings, Inc. seeks registration of RAPUNZEL, in standard characters, for "dolls; toy figures," in International Class 28.[2] In her second amended notice of opposition ("NOO"), Opposer alleges that RAPUNZEL is "synonymous with the name of a well-known childhood fairytale character," and that consumers will recognize it as such. 14 TTABVUE 2, 3 (NOO ¶¶ 2, 6). As grounds for opposition, Opposer alleges that RAPUNZEL not only fails to function as a trademark, but also is generic for and merely descriptive of the identified goods, and that Applicant committed fraud. *Id.* at 3, 5, 8 (NOO ¶¶ 8, 13, 20-24).[3] In its answer, Applicant denies the salient allegations in the second amended notice of opposition, and asserts "affirmative defenses" that merely amplify its denials.

[2] Application Serial No. 87690863, filed November 20, 2017 under Section 1(a) of the Act, based on first use dates of August 2017.

[3] Opposer also alleges that Applicant's mark is "functional under section 2(e)(5) of the Trademark Act," even though this claim was previously dismissed. 14 TTABVUE 5 (NOO ¶ 15); 12 TTABVUE 10; 13 TTABVUE 10 n.1. Opposer claims that she reasserted this dismissed claim "to preserve the right to appeal at a later date the dismissal." 13 TTABVUE 10 n.1.

At this initial stage of this bifurcated case, we need not address the ultimate merits of Opposer's claims, except to the extent those claims may bear on Opposer's entitlement to oppose the involved mark. We thus turn to Opposer's allegations in the second amended notice of opposition intended to support her claim of entitlement to a statutory cause of action.

Opposer alleges that she "is a professor of law teaching trademark law, and is also a consumer who participates amongst other consumers in the marketplace for dolls and toy figures of fairytale characters, including Rapunzel." 14 TTABVUE 6 (NOO ¶ 16). She claims that she and "other consumers will be denied access to healthy marketplace competition" for "products that represent" Rapunzel if private companies are allowed "to trademark the name of a famous fairy tale character in the public domain." *Id.* Opposer further alleges that she "and other consumers will also likely face an increased cost of goods associated with Rapunzel merchandise, given the lack of competition." *Id.* According to Opposer, "more than 171 petition signatures" support her claims of damage. *Id.* (NOO ¶ 17). To determine whether Opposer proved these allegations of entitlement, we turn to the evidentiary record.[4]

[4] Over four years ago, in the pleading phase of this case, the Board issued a decision denying Applicant's motion to dismiss, stating that Opposer "sufficiently alleged that she has a direct and personal stake in the outcome of the proceeding and that her belief of damage has a reasonable basis in fact." 12 TTABVUE 7. The order was based in large part, 12 TTABVUE 9, on *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999), a case that addressed a section of the Trademark Act barring registration of "immoral" or "scandalous" matter. 15 U.S.C. § 1052(a). Six months after the Board's decision on the motion to dismiss issued, the Supreme Court found the bar on registration of "immoral" or "scandalous" matter unconstitutional. *Iancu v. Brunetti*, 139 S.Ct. 2294, 2019 USPQ2d 232043 (2019). Two years after *Brunetti* was decided, and following updates to the "standard for determining whether

## II. The Record

The record consists of the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of Applicant's involved application. In addition, Opposer introduced her own declaration, with exhibits ("Curtin Dec."). 53 TTABVUE. Applicant chose to not introduce any testimony or other evidence. 54 TTABVUE.

## III. Entitlement-Related Facts of Record

Since 2015 Opposer has purchased "dolls, doll fashions, toys, books, e-books, and other fairytale themed items" for her daughter, "including Rapunzel dolls and toys." 53 TTABVUE 2-3, 11-59, 84 (Curtin Dec. ¶¶ 3-6 and Exs. 1-35, 37). Opposer often purchases these products online, finding them by typing "'Rapunzel' into the online search box." *Id.* at 3 (Curtin Dec. ¶ 9). Similarly, "[w]hen shopping in person [Opposer looks] for the Rapunzel name or image to locate products," or asks for "Rapunzel" dolls. *Id.* (Curtin Dec. ¶¶ 10, 11).

Opposer "believes" that if Applicant registers RAPUNZEL she "and other consumers will be denied access to healthy marketplace competition for products that represent the well-known fictional character." *Id.* at 8 (Curtin Dec. ¶ 48). She also contends that she and "other consumers" will "also likely face an increased cost of goods associated with Rapunzel merchandise, given the lack of competition." *Id.* (Curtin Dec. ¶ 49).

a party is eligible to bring a statutory cause of action," the Board denied Opposer's motion for summary judgment on her entitlement to bring a statutory cause of action, and bifurcated this case requiring that Opposer's entitlement be tried first, before the merits. 49 TTABVUE 5-7.

Furthermore, Opposer "believes" that registration of Applicant's mark "could chill the creation of new dolls and toys by fans of the Rapunzel fairytale, crowding out the substantial social benefit of having diverse interpreters of the fairy tale's legacy," and deny Opposer and "other consumers" of "access to classic, already existing, Rapunzel merchandise." *Id.* at 9 (Curtin Dec. ¶¶ 50, 51). Opposer introduced a petition with 432 signatures from people who share Opposer's "belief that registration of [Applicant's proposed mark] would adversely impact a consumer's ability to find dolls depicting the Rapunzel character, and would also harm marketplace competition for dolls personifying the Rapunzel character." *Id.* at 9, 61-83 (Curtin Dec. ¶ 52 and Ex. 36).

**IV. Is Opposer Entitled to a Statutory Cause of Action?**

Entitlement to the statutory cause of action invoked (e.g., opposition or cancellation) is a requirement in every inter partes case. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S.Ct. 82 (2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26, 109 USPQ2d 2061 (2014)). A plaintiff may oppose registration of a mark when doing so is within the zone of interests protected by the statute and she has a reasonable belief in damage that would be proximately caused by registration of the mark. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at * 6-7 (Fed. Cir. 2020), *cert. denied*, 141 S.Ct. 2671 (2021) (holding that the test in *Lexmark* is met by demonstrating a real interest in opposing or cancelling a registration of a mark, which satisfies the zone-of-interests requirement, and a reasonable belief in damage by the registration of a mark, which

demonstrates damage proximately caused by registration of the mark). *Meenaxi Enter., Inc. v. Coca-Cola Co.*, 38 F.4th 1067, 2022 USPQ2d 602, at *3-4 (Fed. Cir. 2022) ("While the zone-of-interest test is not especially demanding … it nonetheless imposes a critical requirement.") (cleaned up).

Here, Opposer has failed to prove she is entitled to the statutory cause of action she invoked – opposing registration of Applicant's mark. The essential problem is that mere consumers such as Opposer are generally not statutorily entitled to oppose registration under 15 U.S.C. § 1063.

### A. The Statute Does Not Entitle Opposer to Oppose Registration Unless Her "Real Interest" Is Commercial

In *Lexmark*, the Supreme Court pointed out that "[w]hether a plaintiff comes within the 'zone of interests' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark*, 109 USPQ2d at 2067. Thus we turn, as *Lexmark* did, to the statute conferring the cause of action in question, in our case 15 U.S.C. § 1063, which entitles "[a]ny person who believes that [she] would be damaged by the registration of a mark" to oppose it.[5]

While that language is quite broad, and might seemingly apply to "all factually injured plaintiffs," it does not, and 15 U.S.C. § 1063 "should not get such an expansive reading." *See Lexmark*, 109 USPQ2d at 2067 (addressing similar language in 15

---

[5] *Lexmark* involved a false advertising counterclaim under 15 U.S.C. § 1125(a), pursuant to which "any person who believes that he or she is or is likely to be damaged" is entitled to the cause of action.

U.S.C. § 1125(a)(1) and quoting *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 266 (1992)). Rather, "a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked,'" in this case, as in *Lexmark*, the Trademark Act. *Lexmark*, 109 USPQ2d at 2068 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

"Identifying the interests protected by" the Trademark Act "requires no guesswork," *Lexmark*, 109 USPQ2d at 2068, because the Act itself identifies those interests in Section 45, which states the Act's purpose:

> The **intent of this chapter is to regulate commerce within the control of Congress** by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; **to protect persons engaged in such commerce against unfair competition**; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C. § 1127 (emphasis added). Thus, the Trademark Act regulates commerce and protects plaintiffs with commercial interests.[6]

[6] Unlike the plaintiff's ground for opposition in *Ritchie*, 50 USPQ2d at 1023, Opposer's grounds for opposition in this case arise out of the Trademark Act's "intent" to "protect persons engaged in … commerce against unfair competition." 15 U.S.C. § 1127. *See generally In re Abcor Dev. Corp.*, 588 F.2d 811, 200 USPQ 215, 217 (CCPA 1978) (a "major reason" for not protecting merely descriptive marks is "to prevent the owner of a [merely descriptive] mark from inhibiting competition").

The Supreme Court's review of this statement of purpose led it to hold, in *Lexmark*, that "to come within the zone of interests in a suit" under Section 43(a)(1) of the Trademark Act, 15 U.S.C. § 1125(a)(1) – which, similar to Section 13, may be invoked only by a plaintiff "who believes that he or she is or is likely to be damaged" by the challenged act – "**a plaintiff must allege an injury to a commercial interest in reputation or sales**." *Lexmark*, 109 USPQ2d at 2069 (emphasis added). The Court specifically stated that while consumers "may well have an injury-in-fact" caused by violations of the Trademark Act, they "cannot invoke the protection" of the statute based solely on injuries suffered as consumers, "a conclusion reached by every Circuit to consider the question." *Id.* ("Even a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the Act's aegis.").[7] *See also Meenaxi*, 2022 USPQ2d 602, at *7 ("Coca-Cola failed to explain how its supposed reputational injury adversely affected its commercial interests other than to speculate that a consumer dissatisfied with Meenaxi's products might blame Coca-Cola."); *Corcamore*, 2020 USPQ2d 11277, at * 7 (a plaintiff "can satisfy the real-interest test by demonstrating a commercial interest"); *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014) (finding entitlement to the statutory cause of action of cancellation because "Cubatabaco has

[7] *Lexmark* cites the following circuit court decisions under 15 U.S.C. § 1125(a) that reveal unanimity among "every Circuit to consider the question": *Phoenix of Broward, Inc. v. McDonald's Corp.*, 489 F.3d 1156, 1170 (11th Cir. 2007); *Made in the USA Foundation v. Phillips Foods, Inc.*, 365 F. 3d 278, 281 (4th Cir. 2004); *Procter & Gamble Co. v. Amway Corp.*, 242 F. 3d 539, 563-564 (5th Cir. 2001); *Barrus v. Sylvania*, 55 F. 3d 468, 470 (9th Cir. 1995); *Serbin v. Ziebart Int'l Corp.*, 11 F. 3d 1163, 1177 (3rd Cir. 1993); *Colligan v. Activities Club of N. Y., Ltd.*, 442 F. 2d 686, 691-692 (2nd Cir. 1971).

a legitimate commercial interest in the COHIBA mark"). *Cf. POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 110 USPQ2d 1877, 1880 (2014) (stating, in the context of a false advertising claim, that "[t]hough in the end consumers also benefit from the Act's proper enforcement, the cause of action [for unfair competition through misleading advertising or labeling] is for competitors, not consumers"). Over 40 years ago, the Board foreshadowed these holdings, finding it "evident that a petitioner must establish a **viable commercial interest** in the subject matter of cancellation." *Miller v. B & H Foods, Inc.*, 209 USPQ 357, 360 (TTAB 1981) (emphasis added).[8] *Cf. Ahal Al-Sara Grp. for Trading v. American Flash, Inc.*, 2023 USPQ2d 79, at *7-9 (TTAB 2023) ("a foreign plaintiff cannot establish entitlement to an abandonment or

[8] Throughout her Trial Brief, Opposer analogizes entitlement to a Trademark Act cause of action to "standing" under the Clayton Antitrust Act, arguing that consumers have standing under the Clayton Act, and should therefore also be entitled to Trademark Act causes of action. 55 TTABVUE 13, 15, 17. We are not persuaded by the analogy or the argument. The analogy is untenable because even if we found the statutes similar or analogous, which we do not, in *Lexmark* the Supreme Court instructs us to focus on the Trademark Act, including 15 U.S.C. §§ 1063 and 1127, in assessing entitlement to a Trademark Act cause of action. Moreover, Opposer's argument is at best overstated, and it is not clear that Opposer would be entitled to a Clayton Act cause of action. In fact, in *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 529 (1983), the Supreme Court recognized that Section 4 of the Clayton Act, read literally, is "broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." Nonetheless, the Court went on to analyze whether the claimed injury "was of a type that Congress sought to address." *Id.* at 538; *see also Philanthropist.com, Inc. v. The General Conference Corp. of Seventh-Day Adventists*, 2021 USPQ2d 643, at *16 (TTAB 2021) (considering whether it can be "assumed Congress intended to authorize a party in Petitioner's circumstances to bring and maintain these cancellation proceedings") (citing *Corcamore*, 2020 USPQ2d 11277, at *7), *aff'd,* 2022 WL 3147202 (Fed. Cir. 2022). To answer this question, the Supreme Court in *Associated Gen. Contractors* specifically considered, *inter alia*, "the directness or indirectness of the asserted injury," 459 U.S. at 540, and whether the claimed damages were "highly speculative." *Id.* at 542. Here, as explained below, even if Opposer's alleged injury is "direct" (despite being merely anticipated, rather than existing), her specific claims of harm are "highly speculative" and unsupported by evidence.

fraud claim based solely on its foreign rights, **without any claim or interest related to U.S. commerce**") (emphasis added).

There is no question that *Lexmark*'s holdings on entitlement to a statutory (Trademark Act) cause of action apply to opposition proceedings such as this one. Indeed, not only was *Lexmark* based on the Trademark Act's statement of purpose, but the Federal Circuit recently found "no principled reason why the analytical framework articulated by the Court in *Lexmark* should not apply to [15 U.S.C.] § 1064," *Corcamore*, 2020 USPQ2d 11277, at *6, a statute which concerns cancellation proceedings and, like opposition proceedings under 15 U.S.C. § 1063, is limited to persons "who believe[ ] that he is or will be damaged" by registration. *See also Spanishtown Ent., Inc. v. Transcend Resources, Inc.*, 2020 USPQ2d 11388, at *1-2 (TTAB 2020).

### B. Opposer Has Not Established a Commercial Interest or Injury Merely By Virtue of Being a Consumer of RAPUNZEL Goods

All of the facts Opposer alleged, and all of the evidence she submitted, relate to her being a consumer of fairytale-themed products. Nowhere has Opposer alleged or established the requisite commercial interest or injury. Rather, Opposer has only alleged and proved that she is a purchaser of goods related to the Rapunzel fairytale. *Lexmark* makes clear, however, that "[e]ven a business" that buys goods or services "is, like consumers generally, not under the Act's aegis." *Lexmark*, 109 USPQ2d at 2069. A fortiori, a mere consumer that buys goods or services is not under the Trademark Act's aegis.

Put simply, the Trademark Act does not provide "consumer standing." That is, it does not entitle mere consumers to a statutory cause of action; a statutory cause of action is reserved for those with commercial interests. *Id.* at 2071. *See also Conte Bros. Auto, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 49 USPQ2d 1321, 1327 (3d Cir. 1998) (Alito, J.) (Section 45 of the Trademark Act "makes clear that the focus of the statute is on anti-competitive conduct in a commercial context. Conferring standing to the full extent implied by the text of § 43(a) would give standing to parties, such as consumers, having no competitive or commercial interests affected by the conduct at issue. This would not only ignore the purpose of the Lanham Act as expressed by §45, but would run contrary to our precedent ….").[9]

### C. Opposer's Alleged Damage is Too Speculative and Remote to Invoke an Opposition Proceeding

It is not enough for Opposer to have alleged her belief in damage in her notice of opposition. Rather, Opposer "must show economic or reputational injury flowing directly from" Applicant's registration of RAPUNZEL. *Lexmark*, 109 USPQ2d at

[9] Opposer attempts to rely on two non-precedential decisions by a single interlocutory attorney in *Flanders v. DiMarzio, Inc.*, Cancellation No. 92064181, but appears to have cited the wrong interlocutory decision in two places in her Trial Brief. 55 TTABVUE 11, 18. In any event, to the extent any non-precedential interlocutory decisions in Cancellation No. 92064181 conflict with current Supreme Court or Federal Circuit caselaw, we decline to follow them. We are bound by Supreme Court and Federal Circuit authority, but not by non-precedential interlocutory decisions. *Cf.* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE ("TBMP") § 518 (2022) (citing *AS Holdings, Inc. v. H & C Milcor, Inc.*, 107 USPQ2d 1829, 1832 (TTAB 2013) and *Harley-Davidson Motor Co. v. Pierce Foods Corp.*, 231 USPQ 857, 859 n.13 (TTAB 1986)). *See also Domino's Pizza Inc. v. Little Caesar Enters. Inc.*, 7 USPQ2d 1359, 1363 n.9 (TTAB 1988) ("Th[e] statement [that evidence of third-party uses were relevant], made over the signature of a single interlocutory Attorney-Examiner of the Board, is not binding on this three-member panel, and we find ourselves in disagreement with the statement.").

2069. However, "[t]hat showing is generally not made when" a defendant's conduct "produces injuries to a fellow commercial actor that in turn affect the plaintiff. For example, while a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, the same is not true of the competitor's landlord, its electric company, and other commercial parties …." *Id.* at 2069-70.

Here, Opposer's limited evidence shows that the damage she believes she will suffer is too remote from registration and is entirely speculative.

For example, Opposer merely assumes that registration of RAPUNZEL will harm "healthy marketplace competition," leading to an "increased cost of goods." 53 TTABVUE 8 (Curtin Dec. ¶¶ 48, 49). Even if this assumption was an attempt to apply an accepted economic theory, there is no evidence of record about any specific economic theory, and even if there was, there is no evidence that particular markets, much less the market for the fairytale-related products at issue, always perform according to general economic theories.

Perhaps more importantly, Opposer merely assumes that, notwithstanding 15 U.S.C. § 1115(b)(4) and other defenses and protections available to sellers of the fairytale-related products at issue, Applicant will be so successful in enforcing its asserted rights that it will reduce "marketplace competition," "chill the creation of new dolls and toys" and prevent "access to classic, already existing, Rapunzel merchandise." *Id.* at 9 (Curtin Dec. ¶¶ 50, 51). This type of speculation, unsupported by any evidence, is not a basis upon which we can find that Opposer is entitled to a

statutory cause of action.[10] *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1799 (Fed. Cir. 2018) ("Attorney argument is no substitute for evidence.") (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 424 F.3d 1276, 1284, 76 USPQ2d 1616, 1622 (Fed. Cir. 2005)); *In re U.S. Tsubaki, Inc.*, 109 USPQ2d 2002, 2006 (TTAB 2014) (finding that there was no proof to support the statements in the record by counsel). *See also TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2210-12 (2021) (in context of assessing standing under Article III of the U.S. Constitution, noting problems with seeking relief for the risk of potential "future harm"); *Meenaxi*, 2022 USPQ2d 602 at *7 ("Coca-Cola did present statements regarding future plans to market Thums Up and Limca beverages more broadly in the United States, but nebulous future plans for U.S. sales cannot be the basis for a Lanham Act claim."). Opposer's allegations of damage are also too remote, because the alleged damage to Opposer depends first on the alleged effect of registration on other commercial doll makers or sellers.

## V. Conclusion

Opposer has not met her burden of proving that she is entitled to invoke the statute authorizing opposition proceedings.

**Decision**: The opposition is dismissed.

---

[10] Registration would not necessarily prevent competitors from manufacturing or selling competing dolls based on Rapunzel, a character from an 1812 Brothers Grimm fairy tale, because a trademark registration has no direct effect on what types of products are available in the marketplace. Rather, it would at most preclude others from using RAPUNZEL as their own source indicator for such products, subject to defenses such as 15 U.S.C. § 1115(b)(4) (creating a defense to infringement where the "term or device … is descriptive of and used fairly and in good faith only to describe the goods and services of such party").

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF system this 20th day of November, 2023, and that a copy was served on all counsel of record by the CM/ECF system.

Dated: November 20, 2023

/s/ Matthew A. Barlow
MATTHEW A. BARLOW
WORKMAN NYDEGGER
60 E. South Temple St, Ste. 1000
Salt Lake City, UT 84111
(801) 533-9800

*Counsel for Appellant Rebecca Curtin*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that, according to the word-processing system used to prepare it, the foregoing OPENING BRIEF OF APPELLANT REBECCA CURTIN is 9,203 words in length, excluding those portions exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b), and therefore complies with the type-volume limitation set forth in Federal Circuit Rule 32(b)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

Dated: November 20, 2023

/s/ Matthew A. Barlow

MATTHEW A. BARLOW
WORKMAN NYDEGGER
60 E. South Temple St, Ste. 1000
Salt Lake City, UT 84111
(801) 533-9800

*Counsel for Appellant Rebecca Curtin*